The attorney for the appellant can take the podium. Thank you. Good morning, Your Honors. May it please the Court, I'm Annie Railton, and I represent the defendant-appellant Rebecca Bayuo. I'd like to reserve two minutes for rebuttal. When the government makes representations about the scope of its case, those representations matter. In this criminal tax fraud case, the government does not dispute that it repeatedly represented that only specific tax returns were relevant, and that all of those relevant returns had been produced. But then, after two weeks of trial, on the night before it planned to call its 27th and final witness, the government produced and sought to introduce 47 completely new tax returns. The district court recognized that admitting these new returns would be unfair in light of the government's representation, and it excluded them. But the court allowed the government to admit a chart comprising the most prejudicial information from 40 of these new returns. Admitting this information, admitting this chart, was just as unfair as admitting the returns themselves would have been. But, counsel, didn't you have all the information that was on the chart before trial? Your Honor, it's correct that, as a technical matter, the defense had the sort of voluminous spreadsheets that contained information about a thousand tax returns, including the 40 at issue here. But sort of the provision of those spreadsheets, you know, to the defense in advance of trial did not provide an advice with the constitutionally required notice. And there are sort of two main reasons for that, and one is the government representations that it had made, you know, specifically excluded the thousand other tax returns that might have been at issue. And the other is sort of the spreadsheet itself. And I'd like to talk about both of those points. The government's representation… Judge Ranchi, may I ask you when the chart was disclosed to you? Yes, Your Honor. It was about three weeks before trial, and I think it was September 25th. And what, if any, objection was made to the chart in that three-week period? So, no objection was made to the chart because the government did not seek to admit the chart. The government was producing dozens of productions during that time period, and to the extent that the government identified documents on its exhibit list, the defense raised concerns and, in some cases, objections. All right, but what I'm trying to understand is, given that the chart had been shown to you three weeks before, what is the unfairness that you're saying your client suffered as a result of its admission then at trial? Yeah, so the unfairness really keys to the fact that the government had told the defense, had told Ms. Bayou, that the universe of returns at issue in this, that there was a relevant universe of tax returns in this case, and that it was limited to the 116 tax returns that themselves had been produced in discovery. And Ms. Bayou, in the bill in particular's briefing, Ms. Bayou specifically raised the concern that the government might try to use some of the approximately 1,000 other returns that she allegedly filed during these five years. And the government, in response to that, said that concern was misleading because, quote, there are not 950 tax returns in the discovery, but rather there are 116 tax returns. And the government also said, quote, the tax returns relevant to this case, end quote, have been produced and are located at specific base numbers. And that, there's no dispute that those representations did not include the spreadsheets that, you know, contained the 1,000 tax returns. But if I understand their argument on appeal, it's that it became an issue at trial, whether he had reused certain dependents and the chart showed that that had been happening pervasively. And so that's why they're saying that it was a fair response to an issue that was then raised at trial. Why shouldn't we accept that? Yeah, so a couple of reasons, Your Honor. So that, you know, the government has the ability to introduce rebuttal evidence, but it has to do so within the limits of what's constitutionally permitted. And the circumstances of this admission, you know, constitute unfair surprise. So that the issue of, you know, the dependent names, you know, appearing on multiple tax returns, you know, that the court did recognize. But how is it a fair surprise if you knew three weeks beforehand that I'm having trouble linking these two points that you're making? Yeah. The unfair surprise, that's what I'm having trouble with. Yeah. So the unfair surprise is tied to both the disclosure that the, the representations that the government made before trial, which were, you know, explicitly that the relevant, that there was a universe of relevant tax returns that did not include these 40 returns that were then produced. And it's compounded by the timing of when they sought to introduce these. So to Your Honor's point, you know, that the issue of sort of dependents appearing on multiple tax returns in a limited way was, was clear from the returns in issue earlier in the case. And the defense strategy through the government's argument is that the 40 additional returns responded to the defense's strategy that Ms. Bayou was not responsible for that information, that other people were responsible for that information. But that issue, that defense argument. Am I right that you did receive the 40, I guess, I thought it was 47, but the additional tax returns from the trial? We received them on the night before what was intended to be the government's last day of its case in chief. So the night before the government plans to call it's last witness. But the district court did not allow them in, isn't that correct? That's correct. But the chart that the district court did allow in would not have been admissible but for the admission of those underlying returns. So the chart was admitted as a summary chart. But as we've established, you had the chart three weeks before the trial, is that correct? It was a, it was a different chart, Your Honor. So just to be clear, the spreadsheet that Ms. Bayou received three weeks before trial was, you know, it was actually two spreadsheets that contained information about approximately a thousand tax returns. So the universe of, you know, conceivably all tax returns that Ms. Bayou had filed or allegedly filed during the five years at issue in the case. The chart that was ultimately admitted contained information about 40 of those returns. And kind of the crux of our argument is that the production of this massive voluminous and inadmissible at the time it was produced spreadsheet did not put Ms. Bayou on notice that the government would seek to use or might seek to use these 40 returns or frankly any other returns, particularly so in light of the government's representation that the relevant tax returns were contained in a different and produced universe. Do you say that the spreadsheets themselves were inadmissible because what? That's right, Your Honor. Under what theory? The spreadsheets themselves were identified as summary charts and Rule 1006 permits the admission of summary charts where the underlying records have been made available to the defense. And there's no, there's no dispute that the vast majority of the hundreds of returns summarized on those spreadsheets were never produced to the defense so that the admissibility of the underlying thousand record spreadsheets, that's not disputed. It was not in it. It was not admissible at trial, but chart that was ultimately introduced was admissible only because, you know, about 12 hours before the government tried to admit it, it produced the 40 tax returns at issue. Your Honor is right. It produced 47, but then sought to use 40 of them on the chart. But as Judge Brazee suggested, wasn't this the government's response to the defendant's argument that she wasn't the source of these dependents, that they came from either the right to respond to that defense? I think the timing matters there, Your Honor, because the district court found that that defense was clear from the very first, you know, from the defense examinations of the very first witnesses in the case. And we would submit that it was clear even from the opening statement and the district court's findings on that are in the record at joint appendix 14, 42, 43, and 1477. It's clear that the court found that the defense argument was, you know, set forth from the beginning of trial and the government did not seek to admit this new evidence until nearly two weeks later after 27 witnesses testified. If you had received these 40, 47 tax returns just before trial, would you have the same argument? I'm trying to understand the salience of the timing here, but would you have the same argument? And if not, why not? Yeah. Your Honor, I think we would have the same evidentiary arguments that we make about the, you know, prejudice under Rule 403, you know, potentially the 404B argument. The constitutional argument, you're right that the timing there matters. And I think it would really depend on the circumstances in which they were produced, the timing in which they were produced. You know, it's hard to answer that hypothetical without knowing sort of where in the case we would have received them. But the reality is we received it here at- Well, the day before trial. Yeah, I think the argument would be different there, right? I think the timing here is a significant component. The government representations are still what they are, but the fact is that in the case we have, those representations continued through two weeks of trial. And it was on what was essentially the last minute in the government's case that they sought to admit this. So I think Your Honor is right, if the timing issue was, you know, dramatically different, I would say that would be a dramatically different scenario if we received them at before trial. And that's not the fact of the case. Sort of the circumstances here that create the unfair surprise, the timing is a significant component of that. Counsel, you've reserved two minutes for rebuttal. We'll hear from the government now. Thank you, Your Honor. Thank you. May it please the Court, Cecilia Vogel for the government, and good morning. I represent the government on appeal and represented the government before the district court. There are three key points. Can you explain the timing? Can you explain the timing that obviously has been troubling this panel? Yes, Your Honor, I can explain the timing. So first, the government received the spreadsheets that were the basis of the summary chart, Government 186R, on September 17th from the IRS in the process of investigating various issues and preparing for trial, and produced those spreadsheets along with other documents to the defense on September 25th, which was just about three weeks before trial. The government only realized the relevance of these additional tax returns that had the same dependence as the tax returns admitted, already admitted at trial, during the course of the trial. And the government lays out the timeline in which it developed this realization in detail in its submission to Judge Kodal in addressing this issue, which is in the appendix at 1450. So it was only on October 18th, during the cross-examination of the government's first identity theft victim witness, that this specific defense theory came to light. And the defense theory was that namely a group of unknown third parties had stolen the victim identities and presented themselves as the victim to the defendant and essentially duped her into filing fraudulent tax returns. That specific theory had never come up in any prior discussions with the defense up to trial, nor did it come up in the government's opening. There was the first inkling of that with respect to that first government victim witness, Luis on October 18th. But even at that point, the government was not completely aware of the theory. The next day on October 19th, during its cross-examination of Bedi Gakine, the defense's cross-examination, and Bedi Gakine's daughter's identity was used on one of Bayou's personal tax returns as a false dependent. It was during that testimony that the defense focused on a connection, a reported connection between one of Bayou's own addresses and the defendant. And it was in the process of listening to that cross-examination that afterwards the government began to look for, began to look for ties between addresses associated with the defendant and the tax return. Did the government request those tax returns before trial? No. As the government explained to Judge Codal, the government had received those tax returns from the IRS the night that they were produced to the defense during trial. Government requested those tax returns from the IRS during trial on October 24th, so the day before. And that was in response to the government, the day before that, October 23rd, had compiled a list of dependent names. So realizing what the defense's argument was that was developing over the trial, it was at that point the government specifically looked for dependents that came up in other tax returns filed by the defendant where there was the same dependent as a tax return already admitted at trial. How did you, how did the government develop the two spreadsheets which, as I understand it, but maybe I've misunderstood, reflected in part or included those tax returns if it didn't have the tax returns? So from spreadsheets, Your Honor, or sorry, your question is how did the government develop those two spreadsheets prior to trial? So the IRS developed those spreadsheets and can develop spreadsheets like that by querying IRS databases. Whenever an individual files a tax return, that then goes into the electronic databases of the IRS, and the IRS can create spreadsheets by querying, for example, as dated here, the defendant's two electronic filing numbers. So they pulled for the period of 2010 to 2014, every tax return filed using the defendant's electronic identification number, and that's how those two spreadsheets were created. And then a summary chart was created the night before it was introduced that reflected those 40, I guess 40 now, tax returns declared. Right. Well, the summary chart was proposed during the course of the briefing as an alternative to admitting the tax returns themselves, and the chart itself was created after Judge Kotel's ruling, and the chart was created very conservatively. It only included 40 returns because each of those returns that were listed had a dependent that had come up previously in the trial. So a tax return already in evidence had the same false dependent. So it was the government. Excuse me. The use of the same dependent on various tax returns was not a new theory. You knew that going in. That was one of the schemes charged against this defendant. What is it that you learned during the trial that you didn't know in advance? So, Your Honor, the government was not aware prior to looking into responding to the defense's argument raised at trial to the extent of the repeat use of dependent. The government had not looked for this previously in the data. It simply had not. What the defense mentioned in its briefing is that the government had looked for multiple tax returns where victims appear, so we did produce to the defense instances where a victim was either used multiple times as a taxpayer or as a dependent, and that was produced to the defense, and the government did look specifically for that. Just with respect to its witnesses and how many different tax returns did they appear during the relevant charge time period, but at no point prior to investigating and investigating how to respond to this specific unanticipated defense argument did the government specifically search for these repeat dependents, and it simply had not anticipated this defense from Bayou. It was something that was not raised in prior discussions. It was not raised in the opening. It was not raised in Bayou's pretrial motion. Certainly, the government anticipated that the defense was going to challenge the elements of the offense, but we had not anticipated this particular argument, and there's really nothing out of the ordinary for the government to seek to investigate and re-review its evidence during trial in response to defense arguments. The defense, of course, appropriately has no obligation to reveal its defense to the government prior to trial, but the corollary of that is that the government may investigate and respond to defenses, and it's normal and permissible for the government to do so, and in this case, the government did so in its case in chief using evidence that was already produced to the defense several weeks before trial. Didn't the government have the repeat dependent issue always on its mind when it brought this case? No, Your Honor. It simply did not. The serf victim part of the case was that the defendant had used stolen identities as the taxpayers. The government was not focused as to who was the dependent on those tax returns, and yes, with respect to the client's team, the focus was on there were false dependents on those clients' tax returns, but the government simply was not focused on whether any of those dependents were repeated across different taxpayers who had tax returns filed by the defendant. That was not something articulated as part of the charge conduct. It was not initially part of the government's theory. It was a point that was developed specifically in response to the defense's argument raised at trial that unknown third parties came to the defendant's tax practice pretending to be identity theft victims and had gotten her to unknowingly file false tax returns. It was in response to that argument that the government investigated this point using the evidence that was previously produced to the defense. I'm not suggesting with the following question that the defense was required to do this, but when the government produced the spreadsheets that at least reflected the 40, 47 tax returns, although the tax returns themselves were not produced, was there any question or was there a request to see all the underlying tax returns on which the spreadsheets rested, the returns that they reflected? No, there was not. And just to be clear, the two spreadsheets that were produced to defense, that were produced three weeks before trial, did contain approximately 1,000 entries for different. Yeah, I got that. 1,000 rows. So, no, there was no request from defense to see the tax returns underlying that spreadsheet. Thank you, counsel. Counsel for defendant has retained two minutes for rebuttal. Thank you, Your Honor. So the crux of the government's argument appears to be that this was fair rebuttal evidence, but this court has found in U.S. v. Baum that the defendant needs to have a fair opportunity to meet, quote, critical and damaging proof that's disclosed. And the circumstances of when this evidence was disclosed and the result that it had on the case, which was a fee change on this issue of dependent overlap, you know, deprived Ms. Bayou of any meaningful opportunity to respond to this evidence. And the government's sort of argument on rebuttal underscores why the chart did not provide Ms. Bayou with constitutionally required notice. The government essentially argues that even though it didn't appreciate the significance of the information on these spreadsheets, Ms. Bayou should have. And that is precisely the kind of impermissible burden shifting that this court disavows in U.S. v. Baum. Are you suggesting that the government concealed the existence of these returns, which I think was the situation in Baum, if I'm not mistaken, I'm trying to find it. But is that what you're suggesting? No, Your Honor, we're not suggesting bad faith. But the government's actions and representations are relevant to the inquiry, right? So regardless of, you know, why the government made the representations that it did about what the universe of relevant returns were and what was not within the universe of relevant returns, which just so you have it, those representations are at 122 through 124 in the joint appendix. It made those representations and then produced this chart that, you know, indisputably contained hundreds of returns that weren't within that relevant universe. So, you know, required. I understand why you think you're prejudiced here. You just pointed out that the government is expecting you to know what they say they didn't know. But if I understand their argument correctly, it's that you should have known it because you were going to make a defense, you were going to advance a defense theory that was contrary to what was shown on the charts. Namely, you were somehow going to try to suggest that the reuse of dependence that was minimally shown by other evidence was explainable. And now they were able to show that that would be unlikely because it happened so pervasively. Why wouldn't you have known from seeing the chart that that would be an argument that would be easily refuted? Yeah, so we wouldn't have known that, Your Honor, because the chart itself was inadmissible evidence. It was produced. No, no, that's a different question. I mean, there's always a question of whether you can advance something at trial that evidence that's otherwise inadmissible refutes. I mean, even a defendant's statements suppressed under Miranda are admissible if he takes the stand and testifies to the contrary. He can't say, well, I testified that way because I thought my post-arrest statements were inadmissible. So here, too, the government had committed itself to not putting in these other tax returns. But when you advance the theory that was refuted by these returns and you had been given notice of it, in fact, given clearer notice because it was on a chart, it wasn't that you had to comb through with them, why are you prejudiced? You took your chances when you advanced the theory, but you knew there was evidence that would refute. Yeah, so the prejudice there, Your Honor, it really keys to what the government represented here. The government should not be able to say to the defense and the district court who relied on those representations in ordering particulars that there's a right on them in what way to advance a theory that you knew the evidence refuted. I mean, I'm not sure how you're entitled to do that, and that's where I'm having trouble. Help me out. Yeah, I think it keys to the representations because the defense is entitled to rely on the disclosure that the government made. Maybe a point, Your Honor, to U.S.B. McIlroy, because I think it's instructive. Can you tell me the name of the case again? U.S.B. McIlroy? Thank you. It just got a little garbled. McIlroy, thank you. No problem. So there, the government described a defendant's pretrial statement as a volunteered, and the court found that to be a potentially misleading characterization because the government didn't disclose that that defendant had invoked his Miranda rights before making that statement, a volunteered statement. And the court found that that rendered the trial unfair and that the effect of nondisclosure was aggravated by the prosecutor's potentially misleading statement. That same principle applies here. You know, if the government says, Ms. Bayou, this is the universe of relevant returns. We don't have to give you particulars about anything else because this is it. But then at the 11th hour of trial, it's able to do exactly what it said it wouldn't do and introduce 40 new returns, doubling the number of returns in the case. That makes the government statement misleading. And the prejudice comes from Ms. Bayou having relied in preparing her defense strategy on the government statement, which is then flipped on its head at a point when she has no opportunity to respond. But the spreadsheet, in answer to my question, I think the government said the spreadsheet itself reflected the 40, 47 returns. So those returns underlie the spreadsheet and therefore also obviously the summary chart. Is that wrong or right? I'm not sure I understand. The spreadsheets before trial contained approximately 1,000 returns, including information about the 47 that were produced at the end of trial. That's what I mean, yeah. Yeah, but not the returns themselves. So it contained 118 columns of information about 1,000 tax returns. So that's where the burden shifting argument comes into play, because requiring Ms. Bayou to take two spreadsheets comprising 1,000 rows of information and 118 columns and putting the burden on her to discern constitutional notice from that voluminous set of materials, that's the kind of burden shifting that this court said is not permissible in U.S. v. Bortnowski. So I set forth in our papers, and as we've argued here today, the government in this case used 40 new tax returns that Ms. Bayou had no notice of and no meaningful opportunity to respond to at the 11th hour in a multi-week trial. That is, you know, deprives her of her constitutional right to a fair trial. The admission of evidence was also, as we set forth in our briefing, an abuse of discretion. And for both of those reasons, a new trial is warranted. Thank you, counsel. We'll reserve decision.